1  ROBERT W. FISCHER, JR. (BAR NO. 57001)
   **FULBRIGHT & JAWORSKI L.L.P.**
2  555 South Flower Street
   Forty-First Floor
3  Los Angeles, California 90071
   Telephone: (213) 892-9200
4  Facsimile:  (213) 892-9494
   rfischer@fulbright.com
5
   FREDERICK ROBINSON
6  LORI-ANN S. BELLAN
   **FULBRIGHT & JAWORSKI L.L.P.**
7  801 Pennsylvania Avenue N.W.
   Washington, D.C. 20004
8  Telephone: (202) 662-0200
   Facsimile:  (202) 62-4643
9  frobinson@fulbright.com
   lbellan@fulbright.com
10
   Attorneys for Plaintiff
11 GORDIAN MEDICAL, INC.

12

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15                                    **SACV10-1202 JST(RNBX)**

16 GORDIAN MEDICAL, INC.,          CIVIL ACTION NO.

17              Plaintiff,

18        v.                        **COMPLAINT**

19 KATHLEEN SEBELIUS, Secretary of
   the Department of Health and Human
20 Services,

21              Defendant.

22

23

24        1.    This is an action for judicial review of two final decisions by the

25 Secretary of the United States Department of Health and Human Services ("HHS"),

26 acting through the Medicare Appeals Council ("MAC"): Docket Number M-10-191

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

(hereinafter referred to as "MAC #1"),[1] and Docket Number M-10-198 (hereinafter referred to as "MAC #2"),[2] respectively, that denied Plaintiff's claims for reimbursement for medically necessary products provided to Medicare beneficiaries.[3]

2.   Plaintiff has exhausted its administrative remedies and is seeking judicial review of claims for certain wound care supplies that were furnished to beneficiaries under Part B of the Medicare program.  The MAC, acting on behalf of the Secretary, has denied reimbursement on all of Plaintiff's claims for wound care supplies.

3.   The total amount in controversy for MAC #1 is $150,000.00.  The total amount in controversy for MAC #2 is $ 640,000.00.

4.   Plaintiff is entitled to relief in this action pursuant to the Medicare Act, 42 U.S.C. § 405(g) and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et. seq.*, including without limitation 5 U.S.C. §§ 704 and 706.

## JURISDICTION AND VENUE

5.   The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  Plaintiff also is entitled to relief in this matter pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et. seq.*, including without limitation, 5 U.S.C. § 704.

6.   Venue is proper in this district pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1391(e).

---

[1] There are a total of 364 individual claims that were consolidated at the Administrative Law Judge hearing level of administrative appeal at issue in MAC #1.

[2] There are a total of 959 individual claims that were consolidated at the Administrative Law Judge hearing level of administrative appeal at issue in MAC #2.

[3] Plaintiff has consolidated MAC #1 and MAC #2 for purposes of this appeal due to the similar nature of the claims at issue as well as the similar basis for the MAC's denial of such claims.

**PARTIES**

7.     Gordian Medical Inc., ("Gordian" or "Plaintiff") is a Nevada Corporation.  Plaintiff has its principal place of business at 17595 Cartwright Road, Irvine, California 92614-5847.  Plaintiff is the successor in interest to American Medical Technologies, Inc. ("AMT").  At the time services were furnished to beneficiaries, AMT was a supplier in good standing with the Medicare program.  AMT voluntarily surrendered its Medicare supplier number on August 8, 2008 and is no longer a Medicare supplier.  Plaintiff has its own Medicare supplier number and is in good standing with the Medicare program.

8.     Plaintiff furnishes Medicare beneficiaries with wound care supplies through a delivery/shipping service.  Plaintiff furnishes wound care supplies which are generally used as primary or secondary dressings on wounds to Medicare beneficiaries throughout the country.

9.     Plaintiff maintains a nationwide staff of more than 150 nurses and physical therapists who have completed the required training and testing to be designated "Certified Wound Specialists" or similar certifications.

10.     Plaintiff is a licensed, bonded and accredited supplier of the Medicare program.

11.     Defendant Kathleen Sebelius is the Secretary of the Department of Health and Human Services.  In that capacity, she is responsible for the conduct and policies of HHS, including the conduct and policies of the Centers for Medicare and Medicaid Services ("CMS") and its contractors.  She is sued in her official capacity.

**THE MEDICARE PROGRAM**

12.     The Medicare Act was established under Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 – 1395ggg, and provides payment for the provision of covered medical care services, equipment, and supplies to eligible aged and disabled persons.

1    13.    Part B of the Medicare Act, 42 U.S.C. §§ 1395j – 1395w-4, provides

2    supplementary medical insurance for covered medical services and covered medical

3    supplies, including Durable Medical Equipment, Prosthetics, Orthotics and

4    Supplies ("DMEPOS").  Surgical dressings and/or wound care supplies are among

5    the medical supplies that may qualify for coverage under Medicare Part B and are

6    items of DMEPOS.

7                        **MEDICARE COVERAGE - GENERALLY**

8    14.    The Medicare statute and its implementing regulations establish

9    conditions and limitations on the coverage of services, supplies and equipment, 42

10   U.S.C. §§ 1395k, 1395l, 1395x(s), as well as provide for exclusions from coverage.

11   42 U.S.C. §§ 1395y(a)(2)-(16); 42 C.F.R § 411.15(a)-(j).  Medicare coverage is

12   limited to services and equipment that are "reasonable and necessary for the

13   diagnosis or treatment of illness or injury or to improve the functioning of a

14   malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

15   15.    Section 1833(e) of the Act states that "[n]o payment shall be made to

16   any provider of services or other person . . . unless there has been furnished such

17   information as may be necessary in order to determine the amounts due such

18   provider or other person . . . for the period with respect to which the amounts are

19   being paid or for any prior period." 42 U.S.C. § 1395l(e).

20   16.    Section 1834(a)(11)(B) of the Act and implementing regulations

21   provide that a written physician order may be required by a supplier before

22   delivering medical supplies.  *See* 42 U.S.C. § 1395m(a)(11)(B)(i); 42 C.F.R. §

23   410.36(b).

24   17.    Section 1835(a)(2)(B) of the Act and implementing regulations require

25   that a physician certify the medical necessity of an item in writing.  *See* 42 U.S.C. §

26   1395n(a)(2)(B); 42 C.F.R. §§ 424.24(b) and (g).

27   18.    Section 1879 of the Act and implementing regulations provides that

28   Medicare will pay for "custodial care" and "services not reasonable and necessary"

1    if the following conditions are met, (a) the services were furnished by a provider or

2    by a practitioner or supplier that had accepted assignment of benefits for those

3    services; and (b) neither the beneficiary nor the provider, practitioner, or supplier,

4    knew, or could reasonably have been expected to know, that the services were

5    excluded from coverage under § 411.15(g) or (k).  *See* 42 U.S.C. § 1395pp; 42

6    C.F.R. § 411.400(a).

7        19.   A provider or supplier is considered to have notice that services are not

8    covered if it is clear that they should have known of Medicare's coverage criteria

9    based upon the receipt of notices from CMS or its agents, publication in the Federal

10    Register, or based upon their "knowledge of what are considered acceptable

11    standards of practice by the local medical community." 42 C.F.R. § 411.406(e).

12        20.   A supplier is liable for the amount of an item where the patient's

13    medical record does not support medical necessity for such item, unless a properly

14    executed Advance Beneficiary Notice was obtained.  *See* Medicare Program

15    Integrity Manual, Pub. 100-08, Chapter 5, § 5.7.

16        21.   The Secretary employs various mechanisms to explain coverage and

17    exclusions from coverage.  For example, a national coverage determination

18    ("NCD") is "a determination by the Secretary with respect to whether or not a

19    particular item or service is covered nationally . . . but does not include a

20    determination of what code, if any, is assigned to a particular item or service

21    covered under this subchapter or a determination with respect to the amount of

22    payment made for a particular item or service so covered."  42 U.S.C. §

23    1395ff(f)(1)(B).

24        22.   In addition, Medicare contractors may issue a "local coverage

25    determination" ("LCD"), which is a "determination by a fiscal intermediary or a

26    carrier under part A . . . or part B . . . respecting whether or not a particular item or

27    service is covered on an intermediary- or carrier-wide basis . . . ."  42 U.S.C. §

28    1395ff(f)(2)(B).  Essentially, an LCD is a decision by a Medicare contractor

1  regarding whether a particular item or service falling within the contractor's
2  jurisdiction is covered as reasonable and medically necessary.  The final rule
3  establishing LCDs was published November 11, 2003.  *See* Medicare Program
4  Integrity Manual, Pub. 100-08, Chapter 13, § 13.1.3.

5      23.    Prior to LCDs, contractors issued local medical review policies
6  ("LMRP") that served the same purpose as an LCD.  Effective December 7, 2003,
7  however, CMS directed contractors to no longer create new LMRPs and instead
8  create LCDs.  All LMRPs were converted to LCDs as of December 2005.  *See*
9  Medicare Program Integrity Manual, Pub. 100-08, Chapter 13, § 13.1.3.

10     24.    A party can request review of an NCD or an LCD.  An NCD can be
11  reviewed by the Departmental Appeals Board ("DAB"), and an LCD may be
12  reviewed by an Administrative Law Judge ("ALJ").  The final decisions of the
13  DAB and the ALJ are subject to judicial review.  42 U.S.C. §§ 1395ff(f)(1) and (2);
14  42 C.F.R. Part 426, Subparts D and E.

15                **MEDICARE PART B CLAIMS PROCESSING**

16     25.    Claims for DMEPOS items and services are submitted to one of four
17  Durable Medical Equipment Medicare Administrative Contractors, commonly
18  referred to as "DME MACs" (formerly known as Durable Medical Equipment
19  Regional Carriers ("DMERCs")) that are agents of CMS.  The geographic
20  jurisdictions of the DME MACs are fixed by CMS and whether a claim falls under
21  their purview depends upon the residence of the Medicare beneficiary on whose
22  behalf a claim for payment is submitted.  Pursuant to contracts between CMS and
23  the individual DME MACs, Medicare claims are processed by the following DME
24  MACs in their respective jurisdictions: (a) NHIC, Corp. – Jurisdiction A; (b)
25  National Government Services/AdminaStar Federal – Jurisdiction B; (c) CIGNA
26  Government Services – Jurisdiction C; and (d) Noridian Government Services –
27  Jurisdiction D.
28

26.     In addition to DME MACs, Durable Medical Equipment Program Safeguard Contractors ("DME PSCs") formerly contracted with CMS and helped administer the Medicare program.   DME PSCs were responsible for creating Medicare coverage guidelines, formulating LCDs (with CMS's approval), and conducting medical review/utilization review of claims within their respective jurisdictions.[4]  Effective March 1, 2008, however, DME PSCs no longer developed, revised or recommended LCDs to the DME MACs.   *See* Medicare Program Integrity Manual, Pub. 100-08, Chapter 13, § 13.1.4.   The DME MACs have full responsibility for developing and revising LCDs, maintaining the LCD record, and for adjudicating LCD challenges.   CMS requires that LCDs developed and revised by the DME MACs be identical for each jurisdiction to ensure uniformity for DMEPOS suppliers that operate nationally.   *Id.*

27.     Medicare contractors, upon receipt and processing of a claim for payment, make an "initial determination," deciding whether the items or services that are the subject of the claim are covered, as well as the amount payable for such items or services.   42 U.S.C. § 1395ff(a)(1); 42 C.F.R § 405.920.

28.     The Medicare statute and implementing regulations provide an administrative appeal process for aggrieved parties who disagree with an initial determination.   The following levels of review are available for claimants who are dissatisfied with any initial determination:

> a)     First Level of Appeal - Redetermination by the contractor
>           that processed the claim, (42 U.S.C. § 1395ff(a)(3); 42

---

[4] There were three DME PSCs during the relevant time period: (a) TriCenturion – Jurisdictions A and B, Dr. Paul J. Hughes, Medical Director; (b) TrustSolutions, L.L.C. – Jurisdiction C, Dr. Adrian M. Oleck, Medical Director; and (c) IntegriGuard, L.L.C. – Jurisdiction D, Dr. Mark D. Pilley, Medical Director.  DME PSCs are no longer performing the above-described functions as Medicare contractors.  Dr. Richard Whitten has replaced Dr. Pilley as the Medical Director in Jurisdiction D.

1    C.F.R. § 405.940);

2        b)    <u>Second Level of Appeal</u> - Reconsideration by a Qualified

3              Independent   Contractor   ("QIC"),   (42   U.S.C.   §§

4              1395ff(b)(1)(A) and (c); 42 C.F.R. § 405.960);

5        c)    <u>Third Level of Appeal</u> – Review by an Administrative

6              Law  Judge  in  the  Office  of  Medicare  Hearings  and

7              Appeals, (42 U.S.C. §§ 1395ff(b)(1)(A), (E) and (d)(1);

8              42 C.F.R. § 405.1002);

9        d)    <u>Fourth Level of Appeal</u> - Review by the Medicare Appeals

10             Council,  (42  U.S.C.  §§  1395ff(d)(2);  42  C.F.R.  §

11             405.1100); and

12       e)    <u>Fifth Level of Appeal</u> – Judicial review in Federal District

13             Court,  (42  U.S.C.  §§  1395ff(b)(1)(A),  (E);  42  C.F.R.  §

14             405.1136).

15   29.    Medicare payment for DMEPOS items and services is currently based

16   on a fee schedule payment methodology, pursuant to section 1834 of the Act.  42

17   U.S.C. § 1395m.  The payment for surgical dressings under Part B is 80 percent of

18   the lesser of the actual charge for the item or the amount set by the fee schedule

19   payment methodology.  *Id.*  Fee schedule payment amounts for DMEPOS are the

20   same for all items included in a HCPCS code, varying only slightly by geographic

21   area.

22                **MEDICARE COVERAGE OF SURGICAL DRESSINGS**

23   30.    There is no NCD for surgical dressings.  However, each of the four

24   contractors listed above have issued an LCD for Surgical Dressings: (a) NHIC,

25   Corp.  –  Jurisdiction  A,  LCD  (L11471);  (b)  National  Government

26   Services/AdminaStar  Federal  –  Jurisdiction  B,  LCD  (L27222);  (c)  CIGNA

27   Government  Services  –  Jurisdiction  C,  LCD  (L11449);  and  (d)  Noridian

28   Government Services – Jurisdiction D, LCD (L11460).  These LCDs for Surgical

1   Dressings are virtually identical.

2        31.   Medicare guidelines state, in relevant part, the following in regards to

3   coverage of surgical dressings:

> Surgical dressings are limited to primary and secondary
> dressings required for the treatment of a wound caused by, or
> treated by, a surgical procedure that has been performed by a
> physician or other health care professional to the extent
> permissible under State law. In addition, surgical dressings
> required after debridement of a wound are also covered,
> irrespective of the type of debridement, as long as the
> debridement was reasonable and necessary and was performed
> by a health care professional acting within the scope of his/her
> legal authority when performing this function. Surgical
> dressings are covered for as long as they are medically
> necessary.
>
> Primary dressings are therapeutic or protective coverings
> applied directly to wounds or lesions either on the skin or
> caused by an opening to the skin. Secondary dressing materials
> that serve a therapeutic or protective function and that are
> needed to secure a primary dressing are also covered. Items
> such as adhesive tape, roll gauze, bandages, and disposable
> compression material are examples of secondary dressings.
> Elastic stockings, support hose, foot coverings, leotards, knee
> supports, surgical leggings, gauntlets, and pressure garments for
> the arms and hands are examples of items that are not ordinarily
> covered as surgical dressings. Some items, such as transparent
> film, may be used as a primary or secondary dressing.

1
2
3
4
5
6
7
8
9
10
11
12
13

> If a physician, certified nurse midwife, physician assistant, nurse practitioner, or clinical nurse specialist applies surgical dressings as part of a professional service that is billed to Medicare, the surgical dressings are considered incident to the professional services of the health care practitioner. (See §§60.1, 180, 190, 200, and 210.) When surgical dressings are not covered incident to the services of a health care practitioner and are obtained by the patient from a supplier (e.g., a drugstore, physician, or other health care practitioner that qualifies as a supplier) on an order from a physician or other health care professional authorized under State law or regulation to make such an order, the surgical dressings are covered separately under Part B.

14  Medicare Benefit Policy Manual, Pub. 100-02, Chapter 15, § 100.

15  **DOCUMENTATION OF MEDICAL NECESSITY – GENERALLY**

16      32.    The Medicare Program Integrity Manual, Pub. 100-08, Chapter 5, §
17  5.7, entitled "Documentation in the Patient's Medical Record", states the following:

18
19
20
21
22
23
24
25
26
27
28

> For any DMEPOS item to be covered by Medicare, the patient's medical record must contain sufficient documentation of the patient's medical condition to substantiate the necessity for the type and quantity of items ordered and for the frequency of use or replacement (if applicable). The information should include the patient's diagnosis and other pertinent information including, but not limited to, duration of the patient's condition, clinical course (worsening or improvement), prognosis, nature and extent of functional limitations, other therapeutic interventions and results, past experience with related items, etc. If an item requires a CMN (Certificate of Medical

1  Necessity) or DIF (DME Information Form), it is recommended
2  that a copy of the completed CMN or DIF be kept in the
3  patient's record. However, neither a physician's order nor a
4  CMN nor a DIF nor a supplier prepared statement nor a
5  physician attestation by itself provides sufficient documentation
6  of medical necessity, even though it is signed by the treating
7  physician or supplier. There must be information in the
8  patient's medical record that supports the medical necessity for
9  the item and substantiates the answers on the CMN (if
10  applicable) or DIF (if applicable) or information on a supplier
11  prepared statement or physician attestation (if applicable). . . . .

12          The patient's medical record is not limited to the
13  physician's office records. It may include hospital, nursing
14  home, or HHA records and records from other health care
15  professionals.

16          The documentation in the patient's medical record <u>does</u>
17  <u>not have to be routinely sent</u> to the supplier or to the DME
18  MACs, DME PSCs, or ZPICs. However, the DME MACs,
19  DME PSCs, or ZPICs may request this information in selected
20  cases. If the DME, DME PSCs, or ZPICs do not receive the
21  information when requested or if the information in the
22  patient's medical record does not adequately support the
23  medical necessity for the item, then on assigned claims the
24  supplier is liable for the dollar amount involved unless a
25  properly executed advance beneficiary notice (ABN) of
26  possible denial has been obtained.

27  *Id.* (emphasis added).

28

DOCUMENT PREPARED
ON RECYCLED PAPER

**FACTUAL BACKGROUND**

33.    Plaintiff is a Medicare supplier of wound care supplies.  Plaintiff primarily furnishes wound care supplies to residents of long term care facilities. Plaintiff files claims with several CMS authorized contractors for the processing and reimbursement of claims for supplies that are furnished to beneficiaries under Part B of the Medicare program.

34.    Plaintiff seeks reimbursement for certain claims for surgical dressings that were submitted under Part B of the Medicare program using the following HCPCS codes: foam dressings (A6209, A6212); collagen dressings (A6021); conforming dressings (A6446); tape (A4450, A4452); hydrogel dressings (A6242); alginate dressings (A6199); xeroform gauze (A6222); and specialty absorptive dressings (A6253).  *See* MAC #1 at 2; MAC #2 at 2.

35.    In support of its claims, Plaintiff provided the following documentation to establish medical necessity: (a) Nursing Facility Patient Wound Care Orders; (b) Wound Care Skin Integrity Evaluation Reports; (c) Facility Admission Face Sheets; (d) Proof of Delivery; and (e) Invoices and packing lists reflecting the dressings shipped to the facility.

36.    After all of its claims were initially denied, Plaintiff requested a redetermination of the claims at issue.  Plaintiff's claims were again denied. Plaintiff then timely filed requests for reconsideration with the relevant Qualified Independent Contractors ("QIC"), which also denied all of Plaintiff's claims purportedly due to a lack of documentation to support medical necessity for the wound care supplies at issue.  Plaintiff timely filed requests for ALJ hearings.

37.    At the ALJ hearing level in both cases, Plaintiff agreed to allow the ALJ to adjudicate a 50-claim sample in order to facilitate the processing of the appeals and extrapolation of the findings to the full universe of claims at issue.

38.   The ALJ, in both cases, disagreed with the QIC and determined that for certain claims, there was sufficient documentation in the record to support medical necessity of the wound care supplies at issue.   The ALJs rendered partially favorable decisions for Plaintiff.[5]  Plaintiff timely appealed the unfavorable portions of the ALJ decisions to the MAC.

39.   The MAC found, in both cases, that the ALJ erred in relying on the documentation submitted by Plaintiff in order to support the medical necessity of the wound care supplies furnished to beneficiaries.   Accordingly, the MAC denied all of Plaintiff's claims for reimbursement.

40.   The MAC based its claim denials on the mistaken assertion that Plaintiff "has not submitted any contemporaneous clinical documentation from the beneficiaries' medical records in response to CMS' Additional Development Request and as required by the LCD."   MAC #2 at 9-10.   There was, in fact, no Additional Development Request to Plaintiff from CMS regarding medical necessity of the wound care supplies at issue.

41.   The MAC also erred in concluding that the "record does not contain any primary medical documentation from the facilities to show the day-to-day care of a beneficiary's wound or the totality of the beneficiary's condition.   In essence, the appellant-generated forms provide the Council with a simple, one-day snapshot of a beneficiary's condition without any longitudinal information.   This limited documentation is insufficient to satisfy the coverage criteria set forth in the LCD and to establish medical necessity."   MAC #2 at 10.   This conclusion was erroneous for at least the following three reasons.

---

[5] In MAC #1, based upon the statistical sample, the ALJ concluded that Plaintiff was entitled to payment of 36.4% of the total amount at issue in the universe.   MAC #1 at 3.   In MAC #2, based upon the statistical sample, the ALJ concluded that Plaintiff was entitled to payment of 48.9% of the total amount at issue in the universe.   MAC # 2 at 3.

DOCUMENT PREPARED
ON RECYCLED PAPER

42.   First, the documentation provided by Plaintiff, including the Nursing Facility Patient Wound Care Orders, Wound Care Skin Integrity Evaluation Reports and Facility Admission Face Sheets, are part of the beneficiaries' medical records.  The documentation furnished by Plaintiff to support medical necessity is certified by the facility staff and/or beneficiary caregivers, reflects information gathered from the beneficiaries' medical record as well as demonstrates which dressings are needed to properly treat the beneficiaries' wounds.  These forms provide the very information required by the Medicare Act and the LCDs.

43.   Second, the MAC adopted an invalid standard for the type of documentation required to support medical necessity.  Requiring a "longitudinal" clinical picture of the patient is simply not the standard to support medical necessity when submitting claims for reimbursement.  Rather, the standard is whether the beneficiary has a current need for the supplies being issued, regardless of what need may or may not have existed at some time in the past.  The supplies provided are predicated on the current status and need of the wound for the dates of service at issue.

44.   Third, the MAC's demand for "longitudinal" information has no support in the applicable LCDs for Surgical Dressings, which state the following in regards to the type of documentation that may be used to support medical necessity:

> Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider". It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare

professionals and test reports. This documentation must be available                     upon                     request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order must specify (a) the type of dressing (e.g., hydrocolloid wound cover, hydrogel wound filler, etc.), (b) the size of the dressing (if appropriate), (c) the number/amount to be used at one time (if more than one), (d) the frequency of dressing change, and (e) the expected duration of need.

A new order is needed if a new dressing is added or if the quantity of an existing dressing to be used is increased. A new order is not routinely needed if the quantity of dressings used is decreased. However a new order is required at least every 3 months for each dressing being used even if the quantity used has     remained     the     same     or     decreased.

Information defining the number of surgical/debrided wounds being treated with a dressing, the reason for dressing use (e.g., surgical wound, debrided wound, etc.), and whether the dressing is being used as a primary or secondary dressing or for some noncovered use (e.g., wound cleansing) must be obtained from the physician, nursing home, or home care nurse. The source of that information and date obtained must be documented in the supplier's records.

*Current clinical information* which supports the reasonableness and necessity of the type and quantity of

surgical dressings provided must be present in the patient's medical records. Evaluation of a patient's wound(s) must be performed at least on a monthly basis unless there is documentation in the medical record which justifies why an evaluation could not be done within this timeframe and what other monitoring methods were used to evaluate the patient's need for dressings. Evaluation is expected on a more frequent basis (e.g., weekly) in patients in a nursing facility or in patients with heavily draining or infected wounds. The evaluation may be performed by a nurse, physician or other health care professional. This evaluation must include the type of each wound (e.g., surgical wound, pressure ulcer, burn, etc), its location, its size (length x width in cm.) and depth, the amount of drainage, and any other relevant information. This information must be available upon request.

LCD for Surgical Dressings (11460 and 11471), at 17 (emphasis added).

45.     The documentation submitted by Plaintiff to support medical necessity complies with the documentation requirements of the LCDs and as reflected in the relevant DME MAC Supplier Manuals.   Plaintiff's documentation includes a facility-certified wound evaluation form that describes the wound type, size, location, dimensions, depth, and current drainage (amount of exudate) from the wound.   The completed order form also complies with the criteria for a written physician order, since it is signed by the treating physician and describes the type, amount and frequency of changes of the dressings ordered.

46.     The LCDs also indicate that additional documentation from hospitals, nursing facilities, and physicians should be available upon request. *Id.*   The administrative records in these cases, however, do not show that such information was specifically requested by the contractors in any of the sample cases.

Furthermore, on the dates of service at issue, the beneficiaries were residents of long-term care facilities, not hospitals, nor were they seen in the physicians' office; therefore, no "hospital records" or "physicians' office records" were generated and thus cannot be supplied. Contrary to the MAC's mistaken assertion, Plaintiff is not a "consultant" and therefore not in a "position to influence how the medical records were created and maintained" by the facilities. *See* MAC #2 at 8, n.6.

47.     Despite this, the MAC has apparently adopted a blanket policy of rejecting Plaintiff's forms as insufficient documentation of medical necessity, regardless of the information contained in each of the forms. And as a result of this policy, the MAC unreasonably denied all of Plaintiff's claims for reimbursement.

48.     Moreover, Plaintiff has consistently provided the same types of documentation described above (*i.e.*, Nursing Facility Patient Wound Care Order Sheets and Wound Care Skin Integrity Evaluations, etc.) in order to support the medical necessity of wound care supplies furnished to Medicare beneficiaries and such documentation has usually been sufficient to establish medical necessity, provided that all other coverage criteria are met.

49.     Plaintiff's documentation, in the same form as submitted in the instant cases, has been validated and approved throughout the course of extensive and repeated Medicare administrative appeals. Over the course of more than 13 years, with respect to more than 70,000 claims, numerous Administrative Law Judges (and earlier, Carrier Hearing Officers) have consistently found that Plaintiff's documentation meet the standards of sections 1862(a)(1) and 1833(e) of the Act, applicable federal regulations, NCDs, LCDs (and their precursors, LMRPs), and/or other standards.

50.     Plaintiff has relied on a series of dozens of administrative decisions stating that its documentation is adequate. Following this consistent validation, Plaintiff has, relying heavily on the form of the approved documentation, adopted nationwide business processes and trained hundreds of personnel in regards to

1 documentation requirements.

2     51.    The MAC also arbitrarily denied all of Plaintiff's claims for hydrogel

3 dressings also purportedly due to lack of additional evidence to support medical

4 necessity. The LCDs permit coverage of hydrogel dressings when such dressings

5 are used on stage II ulcers and the "location of ulcer is sacro-coccygeal area." *See*

6 LCD for Surgical Dressings (11460 and 11471), at 6; MAC #2 at 8-9.

7     52.    In every instance, the hydrogel dressings were used on stage II ulcers

8 located in the sacro-coccygeal area of the beneficiary on whose behalf such

9 dressings were ordered and applied. As acknowledged by the MAC, evidence of

10 the anatomical location is "highly relevant." *Id*. at 9.

11     53.    In addition, Plaintiff provided Nursing Facility Patient Wound Care

12 Order Sheets and Wound Care Skin Integrity Evaluation Forms, which are part of

13 the beneficiaries' medical records, in order to support the medical necessity of the

14 claims for hydrogel dressings furnished to such beneficiaries. As discussed above,

15 such documentation complies with the documentation requirements outlined in the

16 LCDs.

17     54.    Hydrogel dressings contain polymer gels that bind large volumes of

18 liquid. According to guidelines published by the Wound Care Education Institute,

19 hydrogel dressings "absorb excess exudate while producing a moist wound

20 environment."[6]  Thus, hydrogel dressings "provide for moist wound healing,

21 autolytic debridement *and are able to absorb a minimal amount of fluid.*" *Id.*

22 (emphasis added).  For example, where gastric leakage is present, a hydrogel

23 dressing may be indicated. Gastric leakage is caustic and capable of producing skin

24 irritation or burns. A hydrogel dressing would be appropriate for a wound with

25 such leakage for two reasons. First, hydrogel would assist in absorbing the leakage.

26 Second, hydrogel would help in emulsifying the leakage to minimize its tendency

27

28
[6] (http://blog.wcei.net/tag/hydrogel-dressings/., web site address as of July 29, 2010.

1  to remain concentrated and dry on tissues, where it would cause irritation and
2  impede healing.

3      55.    Accordingly, hydrogel dressings are a covered service and medically
4  necessary when supplied to beneficiaries with wounds which were dry, moist or
5  showed minimal drainage and/or leakage.    The LCD provides for the
6  reimbursement of hydrogel dressings when provided for Stage II Pressure Ulcers in
7  certain circumstances.   It states: " Hydrogel dressings are not usually medically
8  necessary for stage II ulcers. Documentation must substantiate the medical
9  necessity for use of hydrogel dressings for stage II ulcers (e.g., location of ulcer is
10 sacro-coccygeal area). The ALJ misinterpreted the anatomical location of the Stage
11 II Pressure Ulcer – the coccyx is a part of the sacro-coccygeal area – and thus
12 incorrectly denied reimbursement for those claims.

13     56.    The forms furnished by Plaintiff demonstrate the necessity of the
14 application of hydrogel dressings to the wounds of the beneficiaries in the relevant
15 claims at issue.

16     57.    The MAC also denied all of Plaintiff's claims for foam dressings. The
17 MAC mistakenly indicated that Plaintiff did not proffer any medical evidence to
18 support the medical necessity of foam dressings at the frequency provided.
19 Plaintiff, however, provided opinions from medical experts regarding the use of
20 foam dressings in excess the frequency stated in the LCDs.   The MAC
21 completely ignored these expert opinions. *See* MAC #1 and MAC #2 (Amended
22 Exhibit List – Master File, Exhibit 2, Medical Expert Opinions of Charles F.
23 Gokoo, M.D., C.W.S.; Richard Simmons, M.D., C.W.S.; Joseph M. McCulloch, Jr.,
24 PhD; Donald E. Mrdjenovich, PhD).

25     58.    The LCD indicates the following coverage criteria regarding foam
26 dressings:

27          Because composite dressings, foam and hydrocolloid wound
28          covers, and transparent film, when used as secondary dressings,

DOCUMENT PREPARED
ON RECYCLED PAPER

1    are meant to be changed at frequencies less than daily,
2    appropriate clinical judgment should be used to avoid their use
3    with primary dressings which require more frequent dressing
4    changes. When claims are submitted for these dressings for
5    changes greater than once every other day, the quantity in
6    excess of that amount will be denied as not medically
7    necessary. While a highly exudative wound might require such
8    a combination initially, with continued proper management the
9    wound usually progresses to a point where the appropriate
10   selection of these products results in the less frequent dressing
11   changes which they are designed to allow . . . .

12   LCD for Surgical Dressings (11460 and 11471), at 4.

13       59.   The LCD further states:

14       Foam dressings are covered when used on full thickness
15       wounds (e.g., stage III or IV ulcers) with moderate to heavy
16       exudate. Usual dressing change for a foam wound cover used as
17       a primary dressing is up to 3 times per week. When a foam
18       wound cover is used as a secondary dressing for wounds with
19       very heavy exudate, dressing change may be up to 3 times per
20       week. Usual dressing change for foam wound fillers is up to
21       once per day.

22   LCD for Surgical Dressings (11460 and 11471), at 5.

23       60.   It does not necessarily follow from the above that a foam secondary
24   dressing is inappropriate on wounds with less than heavy exudate.  Moreover, a
25   limit of three times per week means in some cases dressings will be changed every
26   second day and in some cases every third day – a sporadic, irrational timeline
27   without basis in the standard of care.

28

DOCUMENT PREPARED
ON RECYCLED PAPER

55632932.1

61.    Federal regulation provides that: "ALJs and the MAC are not bound by LCDs, LMRPs, or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a) (emphasis added). In fact, the MAC acknowledges that the LCD contemplates scenarios in which a provider may submit claims for greater quantities of dressings and for more frequent dressing changes than Medicare would cover." MAC #2 at 10.

62.    The standard of care in the medical community is to conduct daily wound assessments of residents in long-term care facilities. In order to properly assess a wound, one must remove all dressings covering the wound and cleanse the wound of any nonviable tissue. Removed dressings are typically soiled with blood, exudate or other bodily fluids, and to reapply these soiled dressings to the wound would grossly deviate from the standard of care and would pose a serious health threat to the beneficiary. Accordingly, the standard of care requires that in conjunction with daily wound assessments, new dressings must be applied after soiled dressings are removed. *See* MAC #1 and MAC #2 (Amended Exhibit List – Master File, Exhibit 2, Medical Expert Opinions of Charles F. Gokoo, M.D., C.W.S.; Richard Simmons, M.D., C.W.S.; Joseph M. McCulloch, Jr., PhD; Donald E. Mrdjenovich, PhD).

63.    This standard of care – daily wound assessments and daily dressing changes where indicated – is driven largely by F314, a federal requirement concerning pressure sores in nursing homes. *See* 42 C.F.R. § 483.25(c); *see also* MAC #1 and MAC #2 (Amended Exhibit List – Master File, Exhibit 2, MOHA F314, Medicare State Operations Manual, Pub. 100-07, App. PP, Guidance to Surveyors for Long-Term Care Facilities, at 1). If a surveyor determines that a nursing facility has violated F314, the surveyor issues a deficiency notice known as an "F-Tag." F314, which is codified in 42 C.F.R. § 483.25(c) states the following:

Pressure sores. Based on the comprehensive assessment of a resident, the facility must ensure that --

(a)     A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and

(b)     A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

64.     CMS has issued guidance concerning F314 which provides that facility staff, in regards to monitoring of a resident's skin condition should "[a]t least daily, . . . remain alert to potential changes in the skin condition and should evaluate and document identified changes." *Id.* at 10.  In addition, "[a] facility should be able to show that its treatment protocols are *based upon current standards of practice. Id.* at 15.  (emphasis added).

65.     Under the language of F314 and the guidance provided by CMS, a facility would be ill-advised to assess a resident's wounds less frequently than daily.  Less-than daily assessments would risk not only an F-Tag but, in the event of death of a resident with a pressure sore, a wrongful death lawsuit by the resident's family.  Most facilities understandably choose to assess wounds daily. As a result, notwithstanding the LCDs, daily assessments and dressing changes have become the standard of care.

66.     Further evidence that the LCDs are inconsistent with the standard of care is found in recommended changes to LCD L11460, prepared by the National Pressure Ulcer Advisory Panel ("NPUAP") at the request of Noridian Administrative Services, LLC, the Jurisdiction D DME MAC.  (*Suggestions for*

1  *LCD Region 4 Revisions,* November 25, 2008.[7])  The *Suggestions for LCD Region*

2  *4 Revisions* propose, among other things, changing the thrice-weekly limit on

3  advanced dressings such as foam, stating in relevant part as follows:

4      [I]t is paramount to remove soiled or wet dressings from the

5      wound, because a wet or moist dressing permits bacterial

6      entrance to the wound surface.  Therefore, the amount of wound

7      fluid should not be the only qualifier justifying more frequent

8      dressing changes.  The frequency of dressing changes should be

9      based upon the clinical decision making of the clinician and/or

10     wound specialist and not on a pre-set time period, nor

11     exclusively predicated on level of exudate or wound fluid.  A

12     wound may be dry or desiccated, but based on the clinical

13     presentation of the wound and patient, it may require daily

14     visualization to promote wound healing.

15 (*Suggestions for LCD Region 4 Revisions* at 1.)

16     67.    According to the MAC, the Plaintiff "relied on the opinions of the

17 beneficiaries' physicians as expressed on the limited, appellant-generated forms it

18 submitted."  MAC # 1 at 8.  It is absurd to think that Plaintiff's reliance on the

19 treating physician's opinion is misplaced.  The MAC has mischaracterized

20 Plaintiff's reliance on the beneficiaries' treating physicians in a misguided attempt

21 to ignore Plaintiff's documentation of medical necessity.  As discussed above,

22 Plaintiff also documented the relevant coverage criteria in compliance with the

23 LCDs for all of the claims at issue.  In addition, federal regulations dictate such

24 reliance.  Federal regulations state in relevant part:

25

26 _____

27 7

28 http://www.npuap.org/pdf/Suggestions%20for%20LCD%20Region%204%20Revis
ions%200109.pdf.  Web site address as of July 29, 2010.

DOCUMENT PREPARED
ON RECYCLED PAPER

(a)   *Purpose*. The physician has a major role in determining utilization of health services furnished by providers. The physician decides upon admissions, orders tests, drugs, and treatments, and determines the length of stay. Accordingly, sections 1814(a)(2) and 1835(a)(2) of the Act establish as a condition for Medicare payment that a physician certify the necessity of the services and, in some instances, recertify the continued need for those services.

Section 1814(a)(2) of the Act also permits nurse practitioners or clinical nurse specialists to certify and recertify the need for post-hospital extended care services.

42 C.F.R. § 424.10.

68.   Plaintiff has been denied reimbursement in the amounts of $150,000.00 for MAC #1 and $640,000.00 for MAC #2.

69.   Plaintiff has been denied reimbursement totaling $790,000.00.

## COUNT I

### (Invalidity of <u>Agency</u> Action In Violation of the Administrative Procedure Act Pursuant to 5 U.S.C. § 706)

70.   The allegations contained in paragraphs 1 - 69 above are realleged and incorporated by reference herein.

71.   Defendant's blanket rejection of Plaintiff's documentation to support medical necessity constitutes invalid agency action.

72.   Defendant's denial of all of Plaintiff's claims purportedly due to a lack of medical necessity is arbitrary and capricious and an abuse of discretion.

73.   Defendant has intentionally acted in ways to arbitrarily deny all of Plaintiff's claims for surgical dressings without justification.

74.   Plaintiff has no other adequate administrative or other remedies available to redress Defendant's repeated denial of Plaintiff's claims for surgical

1   dressings.  5 U.S.C. § 704.

2       75.    Plaintiff is entitled to an order requiring CMS and its contractors to

3   follow established policy regarding documentation requirements and payment on its

4   denied claims as a result of this unlawful blanket rejection of Plaintiff's

5   documentation of medical necessity for the wound care supplies at issue.

6   **COUNT II**

7   **(Arbitrary and Capricious Action In Violation of the**

8   **Administrative <u>Procedure</u> Act Pursuant to 5 U.S.C. § 706)**

9       76.    The allegations contained in paragraphs 1-75 above are realleged and

10   incorporated by reference herein.

11       77.    The Defendant's failure to ignore medical expert opinion in support of

12   medical necessity for claims for foam dressings is arbitrary and capricious and not

13   in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. §

14   706.

15       78.    As a result of Defendant's unlawful actions, Plaintiff has suffered and

16   will continue to suffer irreparable injury.

17   **PRAYER FOR RELIEF**

18       WHEREFORE, the Plaintiff respectfully requests as relief in this action that

19   the Court:

20       1.    Enter an order declaring that Defendant's blanket rejection of all of

21   Plaintiff's documentation used to support medical necessity is null and void and of

22   no effect.

23       2.    Order the Defendant to process and reimburse Plaintiff's for the claims

24   at issue at the appropriate fee schedule amounts that were in effect at the time

25   supplies were furnished to beneficiaries.

26       3.    Award Plaintiff such other relief as the Court may deem just and

27   proper.

28

Dated:  August 9, 2010

ROBERT W. FISCHER, JR.
**FULBRIGHT & JAWORSKI L.L.P.**


By _____
ROBERT W. FISCHER, JR.
Attorneys for Plaintiff
GORDIAN MEDICAL, INC.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| Gordian Medical, Inc. | Kathleen Sebelius, Secretary of the Department of Health and Human Services |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Robert W. Fischer, Jr.<br>FULBRIGHT & JAWORSKI L.L.P.<br>555 S. Flower Street<br>41st Floor<br>Los Angeles, CA 90071<br>213-892-9200 | Attorneys (If Known) |

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff        ☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:**  ☐ Yes   ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:**  ☐ Yes   ☒ No        ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Medicare appeal.

**VII.   NATURE OF SUIT (Place an X in one box only.)**

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☒ 151 Medicare Act | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

| FOR OFFICE USE ONLY:   Case Number: | **SACV10-1202 JST(RNBX)** |
|---|---|

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No  [ ] Yes

If yes, list case number(s): _____

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No  [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    [ ]  A.  Arise from the same or closely related transactions, happenings, or events; or

[ ]  B.  Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]  C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ]  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[X]  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X.   SIGNATURE OF ATTORNEY (OR PRO PER): _~signature~_  Date August 9, 2010

ROBERT W. FISCHER, JR.

**Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gordian Medical, Inc. | CASE NUMBER |
| | **SACV10-1202 JST(RNBX)** |
| PLAINTIFF(S) | |
| v. | |
| Kathleen Sebelius, Secretary of the Department of Health and Human Services | **SUMMONS** |
| DEFENDANT(S) . | |

TO:   DEFENDANT(S): <u>Kathleen Sebelius</u> , Secretary of the Department of Health and
Human Services

A lawsuit has been filed against you.

Within <u>60</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐counterclaim☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Robert W. Fischer, Jr.</u> , whose address is <u>Fulbright & Jaworski L.L.P., 555 S. Flower St., 41st Floor, Los Angeles, CA 90071</u> . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____ AUG - 9 2010 _____          By: _____
                                              **NANCY CASTRO**
                                              Deputy Clerk

                                              (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*